J-S26010-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THEORIN DANIEL NELSON | : | |
| | : | |
| Appellant | : | No. 170 MDA 2025 |

Appeal from the Judgment of Sentence Entered December 19, 2024
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0003734-2023

BEFORE: LAZARUS, P.J., OLSON, J., and BECK, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED: NOVEMBER 4, 2025**

Theorin Daniel Nelson appeals from the judgment of sentence, entered in the Court of Common Pleas of Berks County, following his convictions of three counts of strangulation,[1] and one count each of theft by unlawful taking,[2] terroristic threats,[3] simple assault—bodily injury,[4] simple assault—physical

---

[1] 18 Pa.C.S.A. § 2718(a)(1).

[2] *Id.* at § 3921(a).

[3] *Id.* at § 2706(a)(1).

[4] *Id.* at § 2701(a)(1).

menace,[5] recklessly endangering another person (REAP),[6] criminal mischief,[7] and harassment.[8]  Additionally, Nelson's counsel, William Bispels, Esquire, has filed an application to withdraw as counsel, and an accompanying **Anders**[9] brief.  Upon review, we grant Attorney Bispels' application to withdraw and affirm Nelson's judgment of sentence.

The trial court summarized the factual history as follows:

> On October 1, 2024, Alexandra Clark . . . had a date night planned with her [then-]boyfriend, [] Nelson[.]  However, before she could leave to meet [Nelson], Clark needed to wait for one of her parents to get home so there would be someone to watch their son.[10]  Because Clark needed to wait for one of her parents, she was a couple [of] hours late getting to [Nelson]'s uncle's house where she was meeting [Nelson].  When Clark arrived at [Nelson's] uncle's house, [Nelson] came out of the house and got into the car with her, saying he wanted to talk before they went anywhere.  [Nelson] proceeded to speak to Clark in an insulting and abusive manner, degrading her body, their sexual intercourse, and claiming she was not doing enough for him.  This upset Clark and [she] started to cry and asked [Nelson] to stop[;] however, [Nelson] continued to insult her.  Eventually, Clark told him she was done, their relationship was over[,] and asked him to get out of her car.  [Nelson] did not listen and continued to speak.  Clark started to scream for [Nelson] to get out of her car

---

[5] **Id.** at § 2701(a)(3).

[6] **Id.** at § 2705.

[7] **Id.** at § 3304(a)(5).

[8] **Id.** at § 2709(a)(1).

[9] **Anders v. California**, 386 U.S. 738 (1967); **Commonwealth v. McClendon**, 434 A.2d 1185 (Pa. 1981); **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).

[10] Clark and Nelson had dated previously and had a child together.

and punched her steering wheel. [Nelson] still would not stop [or] get out of her car, [so Clark] shoved him to get him to leave her car. Finally, [Nelson] asked her to get out of the car with him so they could go continue the conversation elsewhere.

Clark agreed to get out of the car with [Nelson but], rather than follow [him] into his uncle's house, she locked all [of the car] doors except for the driver's side door and[,] once [Nelson] walked away from the car[,] Clark jumped back into the car and drove away. As Clark drove away, [Nelson] began to call and [F]ace[T]ime her, threatening that, if she did not come back, he would go to her family's house and start banging on doors. He also threatened to expose their relationship to her family since Clark had not told them she was in a relationship with [Nelson] again because they did not want her to be with him again. He said he would expose their relationship with the hopes that her family would kick her out and she would have to come back to him. Due to these threats, Clark turned her car around and went to [Nelson]'s uncle's house. However, [Nelson] stopped answering her calls, so [Clark] called [Nelson's] uncle and explained the situation to him [and] ask[ed] him to keep [Nelson there].

Once she arrived at the house, [Nelson] came outside and started to hit her car, telling her to get out and that he was upset she called his uncle to get him to calm down. [Nelson] smashed the rear-view mirror on her driver's side, tried to punch through Clark's driver's side window, and punched the roof and the hood of the car repeatedly. [Nelson]'s uncle eventually came out of the house and [] tried to calm him down. Once [Nelson]'s uncle was outside, along with another female and another one of [Nelson]'s uncles, Clark felt safe enough to get out of her car and was willing to talk to the family members that were there. While speaking with [Nelson]'s family, Clark told them that [Nelson] had not met with her family, even though [he] had been telling [his family] he had, and that was why he could not tell them that they were together. This upset [Nelson's] family, and they threatened to kick him out and told him he could not live there anymore because all he does is lie.

[Nelson] told Clark that it was her fault that he was getting kicked out of his house and said they needed to take a drive so everyone could calm down. Clark got into the car with [Nelson], even though [his] uncle did not want [Nelson] to get into the car with her. While [Clark] was driving, [Nelson] reached over to her side

of the car and hit her in the face with an open hand. After [Nelson] hit Clark, she started to cry and said "I can't believe you just hit me. You said you were never going to do this again. Why did you hit me?" To which [Nelson] responded by saying she had screwed everything up, gotten him kicked out of his house, began to insult her repeatedly, and told her to keep driving. Clark kept driving but stayed near her window and crouched over the wheel to put distance between herself and [Nelson] and [to] give herself the ability to put her arm up if he tried to hit her again. Clark continued to drive around and eventually asked if they could stop the car because she just wanted to go home.

Clark eventually pulled the car into the back alley behind where [Nelson]'s uncle lives and parked the car because [Nelson said he was ready to continue their discussion]. While they sat in the car, [Nelson told] Clark what she did wrong, why he had hit her, and how it was her fault. During this, [Nelson] grabbed Clark's purse from where it sat on the floor near his feet, opened it up[,] and took money from it without her permission, claiming he was going to take what she owed him for what he had paid [to set up their planned date]. He took all [of] the cash from her purse but did not take any credit cards[.] The money that was in Clark's wallet was money . . . for their son's birthday party[, totaling] between $250[.00] and $300[.00].

After [Nelson] finished taking the money . . . [Clark] asked how much longer he was going to stay in her car[ and Nelson replied that] he w[ould] stay as long as he wanted. [Clark] asked him to get out of her car and [Nelson] refused[. Clark stated] she would get out of the car[], take the keys, and leave the car to get it at another time. [Upon hearing this, Nelson] reached over with his hand and began to choke [Clark]. As [Nelson] was choking her, Clark was gasping for air[ and struggled to breathe.]

[Eventually, Nelson] let go [and] Clark attempted to [leave the car. However, Nelson] grabbed her again[,] put her in a headlock, pulled her over the middle cons[ole] towards him, and applied pressure through the headlock. [] Clark [kicked open the driver's side door and Nelson released the headlock]. [H]e told her to close the door[] and[,] once she did [so,] he locked it . . . and put her in another chokehold [and told her] "I am trying to kill you."

- 4 -

Eventually, [Nelson] released Clark from the [second] chokehold and when she asked him why he did this to her, he said he was trying to kill her but stopped because he loved her. [Nelson] claimed that he was a different person, asked her if she could see that he had changed because the old him would have just killed her. When Clark asked if she could leave, [Nelson] said no, he was going to keep her there until at least 9:00 p[.]m.[, which is when] she had told her parents she would be home by. . . . Clark said she was not going to stay in her car in the sketchy alley and wanted to move somewhere else, [at which point Nelson] said they would go back to his uncle's house so she could fix the situation and make sure they [would] still let him live there. Once they got back inside, Clark spoke to [Nelson]'s [family to] get them to let [Nelson] continue to live there, claiming that they were working through their issues. . . . [Ultimately, Nelson's uncle agreed to allow him to stay there one more night, and Clark left the house at 9:00 p.m.]

While [Clark] was driving home, [Nelson] called [her] to make sure that she was going to stay with him and make their relationship work. Clark went straight home that night[,] locked the door[,] and went to bed.

[On October 3, 2024, Clark went to the police station and reported the events from October 1, 2024. Police] Officer Katelyn Super . . . took photos of Clark's injuries, specifically the marks, bruises, and cut from when [Nelson] had hit and strangled her. Clark had bruises on her face and arm, as well as a sore throat and nose for about two [] weeks from when [Nelson] had choked and hit her.

Trial Court Opinion, 3/31/25, at 2-6 (citations omitted).

Following a non-jury trial on December 16, 2024, the trial court convicted Nelson of the above-mentioned offenses. On December 19, 2024, the trial court sentenced Nelson to an aggregate term of 10½ to 24 years' incarceration. Nelson filed a timely post-sentence motion, which the trial court denied.

Nelson filed a timely notice of appeal, and both Nelson and the trial court have complied with Pa.R.A.P. 1925. On May 12, 2025, Attorney Bispels filed

- 5 -

an **Anders** brief in this Court, and an accompanying application to withdraw. Nelson did not retain alternate counsel or filed a *pro se* response raising any additional issues. On August 12, 2025, this Court concluded that Attorney Bispels' **Anders** brief was "woefully deficient," and, as a result, denied Attorney Bispels' application to withdraw and directed that he file a new advocate's brief or a compliant **Anders** brief. **See Commonwealth v. Nelson**, 2025 WL 2320320 (Pa. Super. 2025) (unpublished memorandum decision). On September 11, 2025, Attorney Bispels filed the instant **Anders** brief and application to withdraw as counsel.

Before addressing Nelson's issues on appeal, we must again determine whether Attorney Bispels has complied with the dictates of **Anders** and its progeny in petitioning to withdraw from representation. **See Commonwealth v. Mitchell**, 986 A.2d 1241, 1243 n.2 (Pa. Super. 2009) ("[w]hen presented with an **Anders** brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw"). Pursuant to **Anders**, when counsel believes that an appeal is frivolous and wishes to withdraw from representation, he or she must:

> (1) petition the court for leave to withdraw stating that after making a conscientious examination of the record and interviewing the defendant, counsel has determined the appeal would be frivolous, (2) file a brief referring to any issues in the record of arguable merit, and (3) furnish a copy of the brief to defendant and advise him of his right to retain new counsel or to raise any additional points that he deems worthy of the court's attention. The determination of whether the appeal is frivolous remains with the court.

*Commonwealth v. Burwell*, 42 A.3d 1077, 1083 (Pa. Super. 2012) (citations omitted).

Additionally, the Pennsylvania Supreme Court has explained that a proper *Anders* brief must:

> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.

After determining that counsel has satisfied the technical requirements of *Anders* and *Santiago*, this Court must then "conduct a simple review of the record to ascertain if there appears on its face to be arguably meritorious issues that counsel, intentionally or not, missed or misstated." *Commonwealth v. Dempster*, 187 A.3d 266, 272 (Pa. Super. 2018) (en banc).

Instantly, Attorney Bispels filed an *Anders* brief and a separate application to withdraw from representation. In his *Anders* brief, Attorney Bispels stated he made a "thorough" review of the record and concluded Nelson's appeal is frivolous. *See Anders* Brief, at 16. Attorney Bispels sent Nelson a letter informing him of Attorney Bispels' intention to withdraw and advising him of his right to proceed *pro se* or retain alternate counsel. The record reflects that Attorney Bispels furnished Nelson with copies of the

petition to withdraw and the **Anders** brief. Attorney Bispels has substantially complied with the requirements for withdrawing from representation and, therefore, we will examine the record and make an independent determination of whether Nelson's appeal is, in fact, wholly frivolous.

Nelson argues that the Commonwealth presented insufficient evidence to sustain his convictions of three counts of strangulation, two counts of simple assault, and one count each of theft by unlawful taking and terroristic threats. **See Anders** Brief, at 7. Nelson's claims all challenge the sufficiency of the evidence, for which we adhere to the following standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not [re-]weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

**Commonwealth v. Smith**, 97 A.3d 782, 790 (Pa. Super. 2014) (citation omitted).

A person commits the crime of strangulation when they "knowingly or intentionally impede[] the breathing or circulation of the blood of another person by . . . applying pressure to the throat or neck[.]"  18 Pa.C.S.A. § 2718(a)(1).

Instantly, the trial court, in its opinion, credited Clark's testimony that "[Nelson] choked her [three separate times and] she was unable to breathe [during each event.]"  Trial Court Opinion, 3/24/25, at 8.  As such the trial court found that the Commonwealth had satisfied the elements of strangulation.  Upon review of the record, we agree with the trial court's conclusion.  It is clear that Nelson impeded Clark's breathing during each strangulation, stated that he was attempting to kill her, and Clark's neck was bruised.  **See id.** at 5-6, 8.  Accordingly, the Commonwealth presented sufficient evidence to sustain each of Nelson's strangulation convictions.  **See Smith**, **supra**.

A person commits the crime of theft by unlawful taking if "he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof."  18 Pa.C.S.A. § 3921(a).

The trial court addressed this claim as follows:

Clark testified that [Nelson] reached into her purse without her permission and took $250[.00] to $300[.00] from her wallet.  She also testified that she did not get that money back from [Nelson]. . . .  When viewing the evidence in the light most favorable to the Commonwealth . . . [it] is sufficient to convict [Nelson] of theft by unlawful taking.

Trial Court Opinion, 3/24/25, at 9.

- 9 -

After review of the record and the foregoing, we agree with the trial court's determination and affirm on this basis. Accordingly, the Commonwealth presented sufficient evidence to sustain Nelson's theft by unlawful taking conviction. *See Smith*, *supra*.

A person commits the crime of terroristic threats if "the person communicates, either directly or indirectly, a threat to . . . commit any crime of violence with intent to terrorize another[.]" 18 Pa.C.S.A. § 2706(a)(1).

The trial court addressed Nelson's terroristic threats claim as follows:

> When [Nelson] was choking Clark, he said to her "I am trying to kill you" and then continued to choke her while holding her in a headlock. [Nelson] made the threat to Clark while he was in the process of choking her. He told her he was trying to kill her, a crime of violence, effectively terrorizing her and making her believe he [] was going to kill her. . . . [Nelson]'s state[ment] to Clark and his conduct established beyond a reasonable doubt a threat to commit a crime [of violence] with the intent to terrorize Clark.

Trial Court Opinion, 3/24/25, at 10.

After review, we agree with the trial court and conclude that the Commonwealth presented sufficient evidence to sustain Nelson's terroristic threats conviction. *See Smith*, *supra*. Accordingly, he is entitled to no relief on this claim.

A person commits the crime of simple assault—bodily injury "if he . . . attempts to cause or intentionally, knowingly[,] or recklessly causes bodily injury to another[.]" 18 Pa.C.S.A. § 2701(a)(1). Additionally, a person commits the crime of simple assault—physical menace "if he . . . attempts by

physical menace to put another in fear of imminent serious bodily injury[.]"
*Id.* at § 2701(a)(3). Serious bodily injury is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* at § 2301.

To prove that a defendant committed simple assault—physical menace, the Commonwealth must demonstrate that the defendant engaged in menacing or frightening activity with the intent to place another in fear of imminent serious bodily injury. *See Commonwealth v. Reynolds*, 835 A.2d 720, 726-27 (Pa. Super. 2003). Intent can be proven by circumstantial evidence and may be inferred from the defendant's conduct under the attendant circumstances. *See id.*

The trial court addressed Nelson's simple assault challenges as follows:

At trial, Clark testified that [Nelson] put her into a chokehold multiple times and choked her for at least a minute[ each] time. [Further, Nelson] struck Clark in the face while she was driving[.] . . . [Nelson] attempted to intentionally injure [Clark] when he both slapped her in the face and choked her multiple times. Further, [Nelson]'s actions put Clark in fear of serious bodily injury because she could not breathe when he was choking her and[,] after he had hit her[,] she had to cower on her side of the car while driving to potentially protect herself from him hitting her in the face again.

Trial Court Opinion, 3/24/25, at 11-12.

Based upon our review of the record, we agree with the trial court's analysis. It is clear to this Court that Nelson's actions of striking and choking Clark constituted simple assault—bodily injury. *See Smith*, *supra*.

Furthermore, Nelson's repeated assaults of Clark, coupled with his threat to kill her, demonstrate that he had the requisite intent to place Clark in fear of imminent serious bodily injury. **See Reynolds**, **supra**. Accordingly, Nelson is entitled to no relief on these claims.

Based upon the foregoing, we conclude that Nelson's challenges to the sufficiency of the evidence are wholly frivolous. Finally, our independent review of the record discloses no other "arguably meritorious issues that counsel, intentionally or not, missed or misstated." **Dempster**, 187 A.3d at 272. As such, we grant Attorney Bispels' application to withdraw and affirm the judgment of sentence.

Judgment of sentence affirmed. Application to withdraw granted.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 11/04/2025